UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OR AMERICA ) | |
| ) | CRIMINAL INDICTMENT |
| v. ) | |
| ) | NO. 1:09-CR-406-TCB-JFK |
| BENJAMIN STANLEY, et al., ) | |
| ) | |
| Defendants. ) | |

DEFENDANT BENJAMIN STANLEY'S
SENTENCING MEMORANDUM

INTRODUCTION

Defendant Ben Stanley urges the court to impose a sentence in this case that is well-below the Guideline range that is prescribed and far below the sentence recommended by the government. The Guideline range that is computed by the PSR – as well as the Guideline range advocated by the government (four levels below the PSR range) – results in the imposition of a sentence that exceeds twenty years in prison. Even the sentence that the government recommends as "reasonable" exceeds twenty years in prison. Ben Stanley will be fifty years old this year. He is not in good health. A sentence of twenty years may result in his incarceration for the duration of his life. At a minimum, he would be incarcerated for the vast majority of his remaining years in life.

The government's suggestion of what is "reasonable" lacks any basis. It is simply a random suggestion that twenty-two years is supposedly a sentence that is

appropriate. There is no foundation for this recommendation. No effort is made to compare Ben Stanley's conduct and his life, to the conduct of other people convicted of similar or more serious crimes. No effort is made to comply with the statutory command that unwarranted disparities in sentencing should be avoided. No effort is made to account for the fact that restitution will be an impossibility if a sentence of this length is imposed.

In addition, the Guideline calculation itself is wrong, because the guideline calculation fails to properly grant a substantial role reduction to Ben Stanley to reflect his minimal role in the *criminal* conduct that was the focus of this prosecution. Four levels should be deducted from the Guideline calculation to reflect Stanley's minimal role. Though Ben Stanley was an active and significant figure in Conversion Solutions Holdings, Inc., (he was the chief operating officer and was involved in the day-to-day business plan) and though he benefitted financially from the sale of stock (as did members of his family),[1] his role in the perpetration of any *criminal* conduct – issuing false press releases, radio announcements, or other fraudulent conduct – was negligible. As explained below, Stanley's focus was advocating for his business plan and encouraging people to

---

[1] In fact, Lesia, Ben Stanley's ex-wife sold stock and then loaned money to Ben Stanley, which Stanley then used to purchase the car. Ben later borrowed money from his brother, Robert, to repay part of that loan. Ben Stanley still owes the balance of that loan to Lesia.

invest in the company so that his business model could be achieved. His biggest vice, of course, was linking his vision to Rufus Paul Harris.

For these reasons, the defense urges the court to impose a sentence of no more than five years in prison.

## GUIDELINE CALCULATION

After consultation with the government, the defendants and the government have agreed that the loss calculation in the PSR should be reduced by two levels (to reflect a loss amount of $7 - $20 million). In addition, the government has agreed that the "sophisticated means" enhancement is not appropriate in this case. The defense agrees that the remaining Guideline calculations reflected in the PSR are accurate, with the exception of the Role in the Offense section. The defense contends that a four-level reduction is appropriate for Ben Stanley.

The trial in this case demonstrated with utmost clarity that on numerous occasions, Rufus Paul Harris issued press releases and radio announcements that falsely stated the financial condition of Conversion Solutions Holdings, Inc. Harris also filed numerous documents with the SEC that falsely recited the assets of the company. There was no evidence, however, that Ben Stanley ever authored a press release, or contributed to the contents of a press release. Harris acknowledged during trial that Stanley had no role in the creation or distribution of false press releases or SEC filings. Not a single witness testified that Stanley planned with

others to defraud investors, or that he helped devise the scheme to defraud investors. While the government sought to link Stanley to all of Harris's misconduct, the testimony simply did not bear this out.

Stanley was heard on one or two radio announcements, but there was no proof that *he knew* that the assets that were invested in Conversion Solutions Holdings were not, in fact, legitimate or that they were not legally owned by Conversion Solutions Holdings. The plain truth is that Stanley, like so many other people, believed what he was told by Sabra Dabbs, Ismaet Perez and Harris, and by the other individuals who were involved in contributing the assets to Conversion Solutions Holdings.

Throughout the government's sentencing memorandum (Doc. # 270), the government repeatedly refers to "they" without distinguishing between the conduct of Stanley and other people, including Rufus Paul Harris, who operated the company and authored the press releases. The government's sentencing memorandum seeks to justify the imposition of the lengthy sentence for Stanley because, "Many of these filings and releases copied and/or named Defendant Stanley as an alternative contact person." (Doc. # 270 page 5). The fact that Harris suggested that the public could "contact" Stanley hardly demonstrates his personal involvement in authoring, or distributing the false information about the company's assets, including the Venezuelan bond, or the UCC-1 lien assets.

To the extent that Stanley did boast about the assets and contracts of Conversion Solutions Holdings (e.g., GX 50, 60C, 60D), and encouraged individuals to invest in Conversion Solutions Holdings (e.g., "AN" who invested money from her inheritance, Tr. 1262- 1268), there was no evidence that Stanley was not urging people to invest because *he* believed that the investments were sound and that the assets were properly accounted for in the company's financial statement.

Not only was Stanley divorced from the efforts to convince investors to buy stock in Conversion Solutions Holdings, he was also unconcerned with, and completely uninvolved in, the efforts to obtain the bonds and other assets that were used to capitalize the company. He had virtually no involvement in the efforts to obtain the Venezuelan bond, the UCC-1, or any other asset that was used in the inflated SEC filings. He was responsible for creating and implementing the business model, not capitalizing the company. There is no testimony from the trial that claimed Ben's business model had any fraudulent intent or that it was misleading in any way. Several witnesses for the Government actually praised the business plan that Ben had laid out.

Because Stanley had no involvement in preparing false documents that were submitted to the SEC, did not author any press releases that were used to "dupe" the public and only unwittingly boasted about the assets of the company, the court

should find that his role in the offense (as opposed to his role in the company) was minimal. Pursuant to U.S.S.G. § 3B1.1, a four-level reduction is appropriate. *See United States v. Perry*, 340 F.3d 1216 (11th Cir. 2003) (noting that one who is a "leader" in a company, or in recruiting other people to participate in a conspiracy, may still receive a role reduction for his participation in the actual offense conduct); *United States v. Boyd*, 291 F.3d 1274 (11th Cir. 2002) (defendant who is sentenced in drug conspiracy may receive role reduction to reflect the minimal amount of drugs he actually transacted or transported, or to reflect the minimal involvement he had in the conduct with which he was, in fact, involved).

This argument is not to suggest that Stanley was not very involved in the conduct of Conversion Solutions Holdings. He was. But his role in the company was in creating the business model for the operation of the company, not for luring investors to invest in the company. Because the business model for the company was legal and did not involve any fraud, the fact that Stanley was an officer in the company does not translate into a comparable role in the offense. The fact that Stanley was an officer in the company does not mean that he is responsible fo the misconduct of others. After all, *respondeat superior* is not a theory of culpability that could apply in this case.

## ALLEGED "RECIDIVISM"

The government's allegation that Stanley is a "recidivist" is not accurate (Doc. # 270, page 14 - 15).  As the government observes, Stanley has no felony convictions and, with respect to his involvement in Broadband Wireless, he was never charged with a crime and, in fact, had not role whatsoever in any criminal conduct in connection with that company.  The government implies that Harris and Stanley worked together in connection with a "pump and dump" scheme with Broadband.  In fact, Stanley never met Harris until after a lawsuit was filed against them after Stanley's involvement in Broadband had ended.  Much like the events that transpired in this case, Harris encouraged Stanley to sign up as the CFO of Broadband – at a time when they had never even met – and Stanley obliged, believing that Harris was engaged in a legitimate business enterprise.  Stanely was living and working in a timber business in Arkansas while Harris was engaged in the fraudulent activity (if any) in Broadband.

Nor is it accurate that Stanley defrauded a victim into investing in a real estate venture after Conversion Solutions Holdings was shut down (Doc. # 270 page 15).

## LOSS AMOUNT

While the defense and the government have agreed that a "loss amount" of $7 – $20 million should be applied in this case, the evidence at trial (and at sentencing) establishes that literally millions of shares of CSHD stock were sold illegally. Millions of shares of stock were sold to purported victims, despite the fact that the shares were not available to be sold. Holding Stanley accountable for these "losses" violates the principle that one's culpability should be limited to what is reasonably foreseeable as the intended loss. There was no way for Stanley to foresee that millions of shares of stock would be sold (at any price) that were not available to be sold on the market.

## A REASONABLE SENTENCE

Once this court's shackles to the Guidelines were removed by *Booker*, the task of this court has become considerably more difficult. Rather than blind adherence to the Guidelines, the court must now consider a myriad of other factors – non-Guideline factors – in fashioning an appropriate sentence.

The government's effort to arrive at a reasonable sentence is remarkably devoid of even a hint at rational thought. While the defense is certainly grateful that the government has urged that the court impose a sentence of 22 years, the government has offered no reason why this is so. The government suggests that the PSR guideline range results in an unreasonable sentence, not because the

Guideline range is clearly inaccurate, but because . . . just because it is not reasonable.

Fortunately, this court is not without precedent upon which to rely. A remarkably similar case was handled by the district court in the Eastern District of New York nearly four years ago. *United States v. Parris*, 573 F.Supp.2d 744 (E.D.N.Y. 2008). Like this case, the defendants in *Parris* were charged with a "pump and dump" scheme. Like this case, the defendants went to trial, did not cooperate, and were ultimately convicted. Unlike Stanley, the defendants in that case obstructed justice, but the loss amounts in that case were slightly less than in this case.

Judge Block bemoaned the lack of rational guidance in the Guidelines. Seeking to impose a sentence that made sense, he sought advice from the parties about what types of sentences were being handed down in different securities fraud cases in which there were thousands of victims of stock fraud. Attached to that decision are the results of that effort. Judge Block wanted to ensure that, (like his colleague, Judge Rackoff, observed in a similar case, *United States v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006)) sentencing in white collar crime cases did not become a "black mark" on common sense. The defense in this case urges this court to review those tables and to make its own determination about where Ben Stanley fits in the overall scheme of things.

Ben Stanley does not deserve to die in prison like Bernie Madoff who stole billions of dollars from unsuspecting investors. He does not deserve to spend most of the rest of his life in prison like Jeff Skilling (sentenced to 24 years for a fraud that involved over $1,000,000,000). He does not deserve a sentence in the range of Bernie Ebbers (who was sentenced to 300 months – less than the sentence advocated by the government in this case – for a fraud involving billions of dollars) and the Rivas defendants (who were sentenced for frauds involving over $200,000,000 to 15 and 20 years respectively following trial). He is not in the same league as the defendants who perpetrated frauds that netted literally *billions* of dollars in losses, or which resulted in the loss of pensions and jobs for thousands of people such as the Enron, Adelphia, HealthSouth, WorldCom and Computer Associates. Indeed, it is hard to imagine a rational sentencing scheme that would impose a sentence on Ben Stanley that is exponentially more severe than a defendant who commits a violent offense. *See United States v. Rubashkin*, 2010 WL 2471877 (N.D.Iowa 2010).

Judge Block decided that a sentence of 60 months was sufficient to punish the defendants. No more than that is required in this case. To achieve the goal of deterrence, it is hard to imagine that there is any businessman contemplating the commission of a securities fraud offense who would not be deterred by the likelihood of being sentenced to five years in prison. Such a sentence not only

sends a strong and unmistakable message to the business community, but it also allows for the possibility that the defendant, upon release, can begin the process of making restitution to the victims. A sentence that allows Ben Stanley to return to society, therefore, achieves three of the principal goals of our sentencing structure: deterrence, restitution, and incapacitation.

Penny stocks are, by their very nature, speculative. Investing in penny stocks is always a gamble. Stanley did not intend to defraud investors or to induce any investor to purchase shares of stock that, in his mind, were not even available to be bought.

Ben Stanley did not set out to victimize anybody. He did not get involved with Rufus Paul Harris for the purpose of engaging in a fraud or for the purpose of stealing money from investors. Stanley followed Harris from Broadband to Conversion Solutions Holdings, believing that Harris was a legitimate businessman who was experienced in managing a public company. For this error in judgment, Stanley has paid a substantial price. A sentence of life imprisonment for being gullible, however, is not reasonable. Harris fled during trial. Stanley finally broke the bond of loyalty and remained at trial to insist on his innocence. While the jury rejected his counsel's argument, this court should impose a sentence that clearly and unmistakably differentiates the conduct of Harris and Stanley.

Respectfully submitted,

s / *Donald F. Samuel*

_____
Donald F. Samuel, Esq.
Georgia Bar No. 624475
Attorney for Defendant

GARLAND, SAMUEL & LOEB, P.C.
3151 Maple Drive, N.E.
Atlanta, GA  30305
404-262-2225

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OR AMERICA ) | |
| ) | CRIMINAL INDICTMENT |
| v. ) | |
| ) | NO. 1:09-CR-406-TCB-JFK |
| BENJAMIN STANLEY, et al., ) | |
| ) | |
| Defendants. ) | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the within and foregoing **DEFENDANT BENJAMI STANLEY'S SENTENCING MEMORANDUM** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

This the 21st day of February, 2012.

s / *Donald F. Samuel*
_____
Donald F. Samuel, Esq.